**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BEAVEX HOLDING CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-10316 (____)<br><br>Joint Administration Requested |

**DECLARATION OF DONALD VAN DER WIEL IN
SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Donald Van der Wiel, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that:

1. I started with G2 Capital Advisors ("G2") in January 2018 and became a Managing Director in March 2018, specializing in operational and financial restructurings. On or about September 5, 2018, I became the Chief Restructuring Officer (the "CRO") of the above-captioned affiliated debtors and debtors in possession (collectively, the "Debtors"). Prior to being appointed CRO, beginning on or about May 24, 2018, I, along with other G2 personnel served as financial advisors to the Debtors. In my capacities with the Debtors and G2, I have developed a detailed knowledge of and experience with the Debtors' business and financial affairs. More specifically, I have over thirty (30) years of experience in guiding financial turnarounds, operational restructurings and system implementations. I have also served as a C-level executive for middle market companies ranging up to $1.5 billion in revenues in a wide range of industries, including retail, hospitality, e-commerce, logistics, software, off-shore sourcing and business services.

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: BeavEx Holding Corporation (7740); BeavEx Acquisition, Inc. (5497); BeavEx Incorporated (7355); JNJW Enterprises, Inc. (4963); and USXP, LLC (2997). The headquarters for the above-captioned Debtors is located at 2120 Powers Ferry Road SE, Suite 300, Atlanta, GA 30339.

01:23579215.11

2. In my capacity as the Debtors' CRO, along with the assistance of G2 personnel, I am responsible for implementing the Debtors' business plans and strategies and generally overseeing the Debtors' business operations. Accordingly, I have been involved in the Debtors' restructuring process (the "Restructuring"), which includes, but is not limited to (i) providing management leadership and support; (ii) managing and overseeing liquidity and cash disbursements; (iii) developing and executing key restructuring and revitalization initiatives; (iv) preparing for the potential bankruptcy filing and assisting in the bankruptcy cases; (v) communicating with creditors, vendors, employees and other key stakeholders; (vi) assisting the Debtors' legal counsel and other professionals with any matters as requested; (vii) participating in and overseeing the process of pursuing and consummating the sale of any or substantially all of the Debtors' assets; and (viii) consulting with the Debtors' other officers, executives, managers, and member(s) of the boards of director, with respect to the foregoing.

3. Concurrently with the filing of this declaration (the "Declaration") on the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and each hereby commenced chapter 11 cases (collectively, the "Chapter 11 Cases") in this Court.

4. I have been advised by counsel that the Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334. In addition, I have been advised by counsel that venue of the Chapter 11 Cases is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The Debtors intend to operate their businesses and manage their assets and properties as "debtors-in-possession" under sections 1107(a) and 1108 of the Bankruptcy Code while they pursue the sale of substantially all of their assets pursuant to a court-approved

process. To enable the Debtors to operate effectively postpetition and to avoid any adverse effects that the Chapter 11 Cases might otherwise have, the Debtors have requested various types of relief in "first day" motions and applications (collectively, the "First Day Motions") that have been filed with this Court. By the First Day Motions, the Debtors seek to maintain their business operations without interruption and establish administrative procedures to facilitate a smooth transition into chapter 11. I am familiar with each of the First Day Motions, and I believe that the relief sought in each First Day Motion is necessary, in the best interests of the Debtors, and vital to the success of the Chapter 11 Cases.

6. I submit this Declaration, in part, to assist this Court and other parties-in-interest in understanding the circumstances that compelled the commencement of the Chapter 11 Cases. Except as otherwise indicated, all facts set forth in this Declaration are based upon my (i) personal knowledge and/or information that I have acquired from employees who report to me; (ii) consultation with other officers of the Debtors; (iii) review of relevant documents; or (iv) opinion based upon experience, knowledge and information concerning the Debtors' operations, financial condition and industry. I am duly authorized to submit this Declaration on behalf of the Debtors, and if called upon to testify, I could and would testify competently to the facts set forth herein.

7. Part I of this Declaration provides an overview of the Debtors' businesses, organizational structure and prepetition capital structure, a discussion about the circumstances that led to the commencement of the Chapter 11 Cases and the objectives the Debtors seek to accomplish during the pendency of the Chapter 11 Cases. Part II discusses the basis for the relief sought in the First Day Motions. Unless otherwise indicated, the financial information contained herein is provided on a consolidated basis.

## I. Description of the Debtors

**A.     The Debtors' Businesses**

8.     As described more fully below, the Debtors' business operations consist of (i) their transportation broker services, warehousing and courier services (the "<u>Core BeavEx Business</u>") and (ii) their medical logistics support services (the "<u>Medical Logistics Business</u>") which is operated by BeavEx Incorporated's Guardian Medical Logistics Division (the "<u>GML Division</u>").

(i)     *Core BeavEx Business*

9.     The Debtors have become a leading provider of ground and air transportation, warehousing and courier services, providing "last mile" delivery services, often consisting of controlled substances or otherwise highly sensitive materials to over 800 customers nationwide.[2]  To that end, the Debtors contract with approximately 2,200 non-employee independent contract couriers (the "<u>Contract Couriers</u>"), many of whom require certain security clearances or certifications, to transport customers' packages to and from their customers and/or the Debtors' terminals to the end-users.  As a result of the Debtors' Contract Couriers, vast network of warehouses, dedicated full and part-time employees and temporary employees, the Debtors are able to provide their customers with time-critical, same day transportation (including air transportation).  Their vast operations enable the Debtors to provide same-day delivery service to more than 77% of the U.S. population and next-day service to approximately 97% of the U.S. population.

---

[2]  The Debtors' operating entities are:  BeavEx Incorporated; JNJW Enterprises, Inc. ("<u>JNJW</u>"); and USXP, LLC ("<u>USXP</u>").

  (ii) *Medical Logistics Business*

  10. In addition to the Debtors' ground and air transportation services that are part of the Core BeavEx Business, the GML Division also provides medical logistics services related to: (i) on-site drug and alcohol testing that includes random, pre-employment and post-incident blood/alcohol testing; (ii) on-site phlebotomy services; (iii) biometric and phlebotomy venipuncture draws related to company wellness programs and (iv) policy development and assessment of alcohol and drug testing programs (the "<u>GML Services</u>").  To that end, the Debtors contract with approximately 900 non-employee third-party service providers (the "<u>Third-Party Service Providers</u>") who provide the GML Services to the Debtors' customers nationwide.  As a result of the Debtors' network of Third-Party Service Providers, the Debtors have become the nation's largest provider of medical logistics services dedicated solely to the medical industry.

**B.** **The Debtors' Employees and Facilities**

  11. The Debtors are headquartered in Atlanta, Georgia.  They employ approximately 369 full-time employees.  Approximately 40 of the Debtors' employees work out of their headquarters with the remainder working out of either the Debtors' 69 leased warehouse terminal facilities located in 31 states throughout the U.S., or the GML Division headquarters. Additionally, the Debtors also utilize various temporary employees at their leased warehouse terminals for sorting and processing deliveries.  It is because of the Debtors' vast network of warehouse terminal facilities, employees, Contract Couriers and Third-Party Service Providers that the Debtors have been able to provide unparalleled transportation and logistics services to their customers nationwide.

**C.      The Debtors' Corporate Structure**

12.    As illustrated by the organizational structure chart attached hereto as Exhibit A, BeavEx Holding Corporation (the "Parent" or "BeavEx Holding") is a Delaware corporation and the direct parent of BeavEx Acquisition, Inc. ("BeavEx Acquisition"), a Delaware corporation.  BeavEx Acquisition is the direct parent of BeavEx Incorporated, a Connecticut corporation.  BeavEx Incorporated is the direct parent of (i) JNJW, a California corporation and (ii) USXP, a Delaware limited liability company.[3]  The Debtors do not have any non-Debtor affiliates.

**D.      The Debtors' Prepetition Secured Debt and Capital Structure**

13.    As of the Petition Date, the Debtors owe approximately $38.93 million of consolidated secured indebtedness to third parties, all of which, as a result of a series of agreements and transactions further described below, is owed to Eos Partners and ECP Helios IV (as successor-in-interest to Eos Capital Partners IV, L.P.) (ECP Helios and Eos Partners, collectively, the "Eos Parties").  These obligations consist of approximately (i) $10.08 million in aggregate principal and interest amounts outstanding under certain term notes and (ii) $28.85 million in aggregate principal and interest amounts outstanding under certain revolving notes, each of which were issued under that certain Credit and Guaranty Agreement, dated December 19, 2012, by and between the Eos Parties (as assignees of Fifth Third Bank), as lenders, ECP Helios Partners IV, L.P. (as successor-in-interest to Eos Capital Partners IV, L.P.), as agent, and BeavEx Incorporated, JNJW and USXP, as borrowers (as amended and supplemented) (the "Credit Agreement") or the Senior Notes (as defined below).

---

[3] As explained more fully above, BeavEx Incorporated also provides (i) expedited air transportation services and (ii) medical and laboratory through its two divisions, BeavExpedite and the GML Division, respectively.

(i)  *Fifth Third Bank Prepetition Credit Facility Pursuant to the Credit Agreement*

14. Pursuant to the Credit Agreement, BeavEx Incorporated, JNJW and USXP issued to Fifth Third Bank (i) a term note, in the amount of $20 million (the "<u>Fifth Third Term Note</u>"); (ii) a revolving note, in the amount of $18 million (the "<u>Fifth Third Revolving Note</u>") and (iii) a swing or bridge note, in the amount of $1 million (the "<u>Fifth Third Swing Note</u>"[4], together with the Fifth Third Term Note and the Fifth Third Revolving Note, the "<u>Fifth Third Notes</u>").[5]

15. The obligations under the Credit Agreement and the Fifth Third Notes (collectively, the "<u>Credit Agreement Obligations</u>") are guaranteed by each of the Debtors pursuant to that certain security agreement, dated December 19, 2012, by and between Fifth Third Bank and each of the Debtors. Moreover, the Credit Agreement Obligations are secured by a lien on substantially all of the Debtors' assets. The maturity date for the Fifth Third Notes is December 19, 2019.

16. On or about August 11, 2017, the Eos Parties were assigned the debt under the Fifth Third Notes from Fifth Third Bank, and Fifth Third Bank assigned all of its rights under Fifth Third Notes to the Eos Parties, which consisted on the following: (i) $18 million due under the Fifth Third Revolving Note; (ii) approximately $8.33 million due under the Fifth Third Term Note; and (iii) aggregate accrued and unpaid interest due under the Fifth Third Revolving Note and Fifth Third Term Note, in the approximate amount of $1.34 million.

---

[4] The Swing Note was never used, and therefore, no amounts were due on account of the Swing Note.

[5] The interest rate for the Fifth Third Notes is the sum of the Applicable Margin plus the Base Rate (as those terms are defined in the Credit Agreement).

(ii)     *Eos Prepetition Credit Facility Pursuant to the Senior Notes*

17.     On or about June 15, 2017, and in accordance with the Credit Agreement, the Debtors issued a 4.5% interest bearing promissory note, in the amount of $1 million, to the Eos Parties (the "First Eos Note"). Additionally, on August 17, 2017, in accordance with the Credit Agreement, the Debtors issued a 4.5% interest bearing revolving note (as amended), in the maximum principal amount of $5 million, to the Eos Parties (as amended) (the "Second Eos Note," and together with the First Eos Note, the "Eos Notes" or the "Senior Notes"). The Second Eos Note was subsequently amended through a series of amendments, the last of which was executed on or about December 14, 2018, pursuant to which the maximum principal amount of the Second Eos Note was increased to $12 million. The Debtors' obligations under the Senior Notes are secured by a lien on substantially all of the Debtors' assets pursuant to that certain security agreement, dated June 15, 2017, by and between the Debtors and the Eos Parties (as amended). The maturity date of the Eos Notes is December 19, 2019.

18.     As of the Petition Date, there is not less than (i) $18,000,000 in principal amount and $1,163,734.87 in accrued and unpaid interest (through 2/12/19) outstanding under the Fifth Third Revolving Note, (ii) $8,333,314 in principal amount and $675,586.76 in accrued and unpaid interest (through 2/12/19) outstanding under the Fifth Third Term Note, (iii) $1,000,000 in principal amount and $75,000 in accrued and unpaid interest (through 2/12/19) outstanding under the First Eos Note; and (iv) $9,400,000 in principal amount and $284,000 in accrued and unpaid interest (through 2/12/19) outstanding under the Second Eos Note.

(iii)   *Equity Ownership*

19.     The following is the list of equity interest holders and their respective amounts with respect to the parent company, BeavEx Holding:[6]

| **Stockholder** | **Tuchmann Holdings, Inc.** | **Total** |
|---|---|---|
| Series B Convertible Preferred Stock | 183,000 | 183,000 |
| Series C Redeemable Preferred Stock | 85,497 | 85,497 |
| Series D Redeemable Preferred Stock | 26,594 | 26,594 |

20.     With respect to the other subsidiaries, BeavEx Holding owns 100% of the 100 common shares of BeavEx Acquisition.  BeavEx Acquisition owns 100% of the 9.5 common shares of BeavEx Incorporated.  BeavEx Incorporated owns 100% of the 1,000 common shares of JNJW.  Finally, BeavEx Incorporated owns 100% of the 100 units in USXP.

**B.     Events Leading to Chapter 11 Cases**

21.     In November 2011, Eos Partners purchased the Debtors as a non-asset based (i.e. asset-light) provider of local route-based, same day transportation and logistics services that initially focused on providing financial delivery services to their customer base. However, due to subsequent technological advances in check scanning, the demand for a large portion of the Debtors' financial services, in the form of paper check delivery services, was

---

[6] On or about December 17, 2018, the Eos Parties served their Abandonment of Securities of BeavEx Holding Corporation (the "Abandonment Notice") on the Debtors.  In the Abandonment Notice, the Eos Parties stated that they were abandoning, relinquishing and surrendering all rights, title and interests in and to any and all shares of capital stock of the Debtors owned by them (the "Securities") as well as any and all rights to distributions, any and all voting rights and any and all other economic, legal or other rights associated with the Securities.  The Securities referenced in the Abandonment Notice included the following:  (i) 336,667 Series A Convertible Preferred Stock, 46,292 Series D Redeemable Preferred Stock, 42,083 Series E Redeemable Preferred Stock and 44,191 Series F Redeemable Preferred Stock belonging to Eos Capital and (ii) 63,333 Series A Convertible Preferred Stock, 8,708 Series D Redeemable Preferred Stock, 7,917 Series E Redeemable Preferred Stock and 8,309 Series F Redeemable Preferred Stock belonging to Eos Partners.

significantly reduced, thus negatively impacting the profitability of the Debtors' asset-light financial services business model.

22. Beginning in the third quarter of 2012, in an effort to offset the declines in the financial services facet of their operations, the Debtors expanded their business model to an asset-heavy model in order to pursue customer segments requiring expanded services such as sortation, cross-docking and storage. However, the transition also required significant investments in fixed terminal labor and facility costs. The increased costs associated with the conversion from an asset-light business model to an asset-heavy business model coupled with the decline in the financial services, resulted in EBITDA losses of: $7.1 million in 2014; $8.7 million in 2015; $3.3 million in 2016; and $2.8 million in 2017. These losses continued in 2018, which has limited the Debtors' liquidity and impaired their ability to raise capital.

**C.    Objectives of the Chapter 11 Cases / Proposed Sale**

23. Facing tightening liquidity due, in part, to the significant decrease in revenues and the increased costs associated with transitioning to an asset-heavy model, the Debtors, in consultation with their legal and financial advisors, made the good-faith decision to commence the Chapter 11 Cases and to pursue a potential sale of any or all of the Debtors' assets in order to preserve and maximize the value of their assets for the benefit of all stakeholders. To that end, on or about September 7, 2018, the Debtors and their professional advisors began a robust and aggressive marketing effort for substantially all or some of the Debtors' assets which resulted in several expressions of interests.

24. After consideration of various expressions of interest, certain of the Debtors negotiated and ultimately entered into that certain asset purchase agreement by and between TForce Final Mile, LLC, TForce Final Mile West, LLC and TForce Logistics, LLC

(collectively, "TForce" or the "Lead Bidder"), as buyer, and BeavEx Incorporated, JNJW Enterprises, Inc., and USXP, LLC, as seller, dated February 14, 2019 (the "Lead Agreement" or "APA") for the sale of a majority of their assets. The Lead Agreement, among other things, provides for cash in the approximate amount of $7.2 million, plus assumption of certain liabilities. The Lead Agreement preserves the Debtors' business as a going concern, provides for a substantial number of the Debtors' employees to remain employed and for the retention of many of the non-employee independent Contract Couriers and non-employee Third-Party Service Providers to continue to provide their respective services. The Lead Agreement is not conditioned on financing or the completion of due diligence.

25. The Debtors have determined that the floor established by the proposed sale to the Lead Bidder, subject to higher and better bids, with approval of the Court in an open auction process pursuant to section 363 of the Bankruptcy Code, affords the Debtors the best opportunity to maximize value for the benefit of their stakeholders. Accordingly, concurrently with the filing of their bankruptcy petitions, the Debtors have filed a motion (the "Sale Motion") with the Court seeking, among other things, entry of orders (i) approving bid and auction procedures (including certain bid protections negotiated with TForce) and (ii) approving the sale of substantially all of the Debtors' assets, including the sale of the assets pursuant to the Lead Agreement.

26. The Debtors believe that the commencement of the Chapter 11 Cases and the implementation of an orderly sale process as set forth in the Sale Motion, under the supervision of this Court, that provides a floor against which other interested parties may bid, will permit the Debtors to consummate a going concern sale of all or substantially all of the Debtors' assets, and thus maximize value of their estates for all creditors and parties in interest.

## II. Debtors' First Day Motions[7]

27. To enable the Debtors to minimize the adverse effects on their ongoing business operation upon the filing of the Chapter 11 Cases and to promote a smooth transition, the Debtors have requested various relief in the First Day Motions. The First Day Motions seek authority to, among other things, obtain debtor-in-possession financing on an interim and final basis, use of cash collateral, and pay certain prepetition claims in order to preserve vendor and customer relationships, maintain employee morale, ensure the continuation of the Debtors' cash management system and maintain critical business operations without disruption. Obtaining Court approval of the relief sought in the First Day Motions is essential to giving the Debtors an opportunity to work towards the proposed sale, thus maximizing the Debtors' estates for the benefit of their stakeholders.

28. As explained above, facing tightening liquidity due, in part, to the significant decrease in revenues and the increased costs associated with transitioning to an asset-heavy model, the Debtors, in consultation with their legal and financial advisors, made the good-faith decision to commence the Chapter 11 Cases and to pursue a potential sale of any or all of the Debtors' assets. After an extensive marketing effort and consideration of various expressions of interest, the Debtors entered into the Lead Agreement for the sale of a majority of their assets.

29. The Debtors require postpetition financing and use of cash collateral to among other things, pay the costs and expenses associated with administering the Chapter 11 Cases, continue the orderly operation of the Debtors' business, maximize and preserve the Debtors' going concern value, make payroll and satisfy other working capital and general corporate purposes. To that end, the Debtors have contemporaneously filed a motion (the "DIP

---

[7] Capitalized terms used but not defined in this section have the meanings given them in the relevant First Day Motion.

01:23579215.11

- 12 -

Motion") seeking interim and final orders (together, the "DIP Orders") authorizing postpetition financing and the use of cash collateral. Without access to the DIP Facility (as defined in the DIP Motion) and the continued use of Cash Collateral (as defined in the DIP Motion), the Debtors and their estates would suffer immediate and irreparable harm. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without access to the DIP Facility and the authorized use of Cash Collateral.

30. As noted above, all of the Debtors' assets constitute the collateral of the Eos Parties under the Credit Agreement and the Senior Notes. In negotiating the terms of their proposed postpetition financing, the Eos Parties were unwilling to consent to the priming of their prepetition liens by a third-party lender, even if such third party lender was willing to lend. The proposed debtor-in-possession financing was negotiated by me and the Debtors' independent director in consultation with the Debtors' legal and financial advisors and was negotiated in good faith and at arms' length. The proposed postpetition financing proposes certain highly favorable terms that I believe a different lender would be unwilling to offer, including (i) no fees such as unused line or closing fees and (ii) no post-petition debt service payments. The proposed financing terms are therefore fair and reasonable.

31. Under the circumstances, the Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than

the DIP Lender (as defined in the DIP Motion) on terms more favorable than the terms of the DIP Facility. The only viable source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Facility. The Debtors require both additional financing under the DIP Facility and the continued use of Cash Collateral under the terms of the DIP Orders to satisfy their postpetition liquidity needs.

32. Additionally, several of the First Day Motions request authority to pay certain prepetition claims. Rule 6003 of the Federal Rules of Bankruptcy Procedure, provides, in relevant part, that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting . . . a motion to pay all or part of a claim that arose before the filing of the petition." In light of the requirement, the Debtors have narrowly tailored the relief requested for immediate authority to pay certain prepetition claims the failure of which to pay would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

33. I have reviewed each of the First Day Motions. The facts stated therein are true and correct to the best of my information and belief, and I believe that the relief sought in each of the First Day Motions, which provide for the obtaining of debtor-in possession financing on an interim basis as well as providing for the payment of certain prepetition claims is necessary to enable the Debtors to operate in chapter 11 with minimal disruption of their business operations and constitutes a vital part of consummating the proposed sale and administering the Chapter 11 Cases.

## CONCLUSION

In furtherance of their reorganization efforts, the Debtors respectfully request that orders granting the relief requested in the First Day Motions be entered.

Dated:   February 18  , 2019
        Wilmington, Delaware

/s/ Donald Van der Wiel
Donald Van der Wiel
Chief Restructuring Officer
BeavEx Holding Corporation, et al.,
Debtors and Debtors in Possession

## **Exhibit A**

Organizational Structure

