# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BEAVEX HOLDING CORPORATION, *et al.*,[1] | Case No. 19-10316 (LSS) |
| Debtors. | Jointly Administered |
| | **Hearing Date:  May 15, 2019, at 10:00 a.m. ET**<br>**Objection Deadline:  May 8, 2019 at 4:00 p.m. ET** |

## DEBTORS' MOTION PURSUANT TO SECTIONS 105 AND 363(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR AN ORDER APPROVING AND AUTHORIZING A SETTLEMENT BY AND AMONG THE DEBTORS, THE EOS PARTIES, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

The above-captioned affiliated debtors and debtors in possession (collectively, the "Debtors") hereby submit this motion (this "Motion") for entry of an order (the "Proposed Order"), substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving the settlement (the "Settlement") embodied in the Proposed Order by and among the Debtors, Eos Partners, L.P. and ECP Helios IV, L.P. (as successor-in-interest to Eos Capital Partners IV, L.P.) (together with each of their affiliates in all capacities, the "Eos Parties") and the Official Committee of Unsecured Creditors (including each of its members in their individual capacity, the "Committee" and together with the Debtors and the Eos Parties, the "Parties").  In support of this Motion, the Debtors respectfully represent as follows:

---

[1]  The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  BeavEx Holding Corporation (7740); BeavEx Acquisition, Inc. (5497); BeavEx Incorporated (7355); JNJW Enterprises, Inc. (4963); and USXP, LLC (2997).  The headquarters for the above-captioned Debtors is located at 2120 Powers Ferry Road SE, Suite 300, Atlanta, GA 30339.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (the "Amended Standing Order").  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory and legal predicates for the relief sought herein are sections 105 and 363(b) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules.

## BACKGROUND

3.      On February 18, 2019, each of the Debtors commenced a voluntary case under the Bankruptcy Code (collectively, the "Chapter 11 Cases").  The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On March 1, 2019, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee in these Chapter 11 Cases.  No request has been made for the appointment of a trustee or examiner.

4.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in the *Declaration of Donald Van der Wiel in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 2] (the "First Day Declaration").

## RELEVANT BACKGROUND[2]

### A.    The Debtors' Prepetition Debt Structure

5.      As of the Petition Date, the Debtors owed approximately $38.93 million of consolidated secured indebtedness to third parties, all of which, as a result of a series of agreements and transactions further described below, is owed to the Eos Parties.  These obligations consist of approximately (i) $10.08 million in aggregate principal and interest amounts outstanding under certain term notes and (ii) $28.85 million in aggregate principal and interest amounts outstanding under certain revolving notes, each of which were issued under (x) that certain Credit and Guaranty Agreement, dated December 19, 2012, by and between the Eos Parties (as assignees of Fifth Third Bank), as lenders, ECP Helios Partners IV, L.P. (as successor-in-interest to Eos Capital Partners IV, L.P.), as agent, and BeavEx Incorporated, JNJW and USXP, as borrowers (as amended, supplemented and otherwise modified from time to time, the "Credit Agreement") or (y) those certain Senior Notes (as defined below).

(i)      *Fifth Third Bank Prepetition Credit Facility Pursuant to the Credit Agreement*

6.      Pursuant to the Credit Agreement, BeavEx Incorporated, JNJW and USXP issued to Fifth Third Bank (i) a term note, in the amount of $20 million (the "Fifth Third Term Note"); (ii) a revolving note, in the amount of $18 million (the "Fifth Third Revolving Note") and (iii) a swing or bridge note, in the amount of $1 million (the "Fifth Third Swing Note", together with the Fifth Third Term Note and the Fifth Third Revolving Note, the "Fifth Third Notes").

7.      The obligations under the Credit Agreement and the Fifth Third Notes (collectively, the "Credit Agreement Obligations") are guaranteed by each of the Debtors

---

[2]  To the extent that there is any inconsistency between this Motion and the terms of the Final DIP Order, the Final DIP Order shall govern.

pursuant to that certain Security Agreement, dated December 19, 2012, by and between Fifth

Third Bank and each of the Debtors.  The Credit Agreement Obligations are secured by a lien on

substantially all of the Debtors' assets.  The maturity date for the Fifth Third Notes is December

19, 2019.

        8.      On or about August 11, 2017, the Eos Parties were assigned the debt under

the Fifth Third Notes from Fifth Third Bank, and Fifth Third Bank assigned all of its rights under

Fifth Third Notes to the Eos Parties, which consisted on the following:  (i) $18 million due under

the Fifth Third Revolving Note; (ii) approximately $8.33 million due under the Fifth Third Term

Note; and (iii) aggregate accrued and unpaid interest due under the Fifth Third Revolving Note

and Fifth Third Term Note, in the approximate amount of $1.34 million.

      (ii)    *Eos Prepetition Credit Facility Pursuant to the Senior Notes*

        9.      On or about June 15, 2017, and in accordance with the Credit Agreement,

the Debtors issued a 4.5% interest bearing promissory note, in the amount of $1 million, to the

Eos Parties (the "First Eos Note").  Additionally, on August 17, 2017, in accordance with the

Credit Agreement, the Debtors issued a 4.5% interest bearing revolving note (as amended), in the

maximum principal amount of $5 million, to the Eos Parties (as subsequently amended through a

series of amendments, the last of which was executed on or about December 14, 2018, pursuant

to which the maximum principal amount of the Second Eos Note was increased to $12 million,

the "Second Eos Note," and together with the First Eos Note, the "Senior Notes").  The Debtors'

obligations under the Senior Notes are secured by a lien on substantially all of the Debtors'

assets pursuant to that certain security agreement, dated June 15, 2017, by and between the

Debtors and the Eos Parties (as amended).  The maturity date of the Senior Notes is December

19, 2019.

10.     As of the Petition Date, there was not less than approximately
(i) $18,000,000 in principal amount and $1,163,734.87 in accrued and unpaid interest (through
2/12/19) outstanding under the Fifth Third Revolving Note, (ii) $8,333,314 in principal amount
and $675,586.76 in accrued and unpaid interest (through 2/12/19) outstanding under the Fifth
Third Term Note, (iii) $1,000,000 in principal amount and $75,000 in accrued and unpaid
interest (through 2/12/19) outstanding under the First Eos Note; and (iv) $9,400,000 in principal
amount and $284,000 in accrued and unpaid interest (through 2/12/19) outstanding under the
Second Eos Note.

**B.    The Debtors' DIP Facility and Committee's Challenge Period**

11.     The Debtors required postpetition financing and use of cash collateral to
among other things, (i) pay the costs and expenses associated with administering the Chapter 11
Cases, (ii) continue the orderly operation of the Debtors' business, (iii) maximize and preserve
the Debtors' going concern value, (iv) make payroll and (v) satisfy other working capital and
general corporate purposes.  To that end, on the Petition Date, the Debtors filed a motion (the
"DIP Motion") seeking interim and final orders authorizing postpetition financing and the use of
cash collateral from the Eos Parties.  Without access to the DIP Facility (as defined in the DIP
Motion) and the continued use of Cash Collateral (as defined in the DIP Motion), the Debtors
and their estates would have suffered immediate and irreparable harm.  The Debtors did not have
sufficient available sources of working capital and financing to operate their businesses or
maintain their properties in the ordinary course of business without access to the DIP Facility
and the authorized use of Cash Collateral.

12.     On February 21, 2019, the Court entered the *Interim Order Pursuant to 11
U.S.C. §§ 105, 361, 362, 363, 364 and 507, Bankruptcy Rules 2002, 4001, 6004 and 9014 and*

*Local Bankruptcy Rule 4001-2, (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' Limited Use of Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "<u>Interim DIP Order</u>") [Docket No. 40] authorizing the Debtor to obtain post-petition financing from the Eos Parties on an interim basis and scheduled a final hearing for March 13, 2019 to consider further debtor-in-possession financing.

13.     Following the Committee's appointment on March 1, 2019, the Committee immediately commenced substantial due diligence regarding the Debtors' finances and operational affairs and the Parties engaged in lengthy and protracted discussions concerning, among other things, the proposed debtor-in-possession financing offered by the Eos Parties.

14.     On March 8, 2019, the Committee filed an extensive objection to the DIP Motion (the "<u>Committee DIP Objection</u>") [Docket No. 114].  Thereafter, the Parties prepared for a heavily contested final hearing regarding the proposed post-petition financing while simultaneously engaging in settlement discussions regarding, among other things, the Committee DIP Objection.

15.     Prior to the commencement of a contested hearing on the Committee DIP Objection, the Parties announced a consensual resolution of the Committee's issues.  Following the presentation of a consensual order at the March 13, 2019 hearing, the Court entered the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Bankruptcy Rule 4001-2, (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' Limited Use of Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "<u>Final DIP Order</u>") [Docket

No. 143].  The proposed Final DIP Order, *inter alia*, (i) excluded certain unencumbered property from the DIP Collateral and the Prepetition Secured Lenders' Adequate Protection Liens, (ii) required the DIP Lenders to marshal their recoveries from all other DIP Collateral before seeking recovery from the proceeds of Avoidance Actions, (iii) increased the DIP Facility from $1.0 million to $1.245 million, (iv) granted the Committee certain reporting and consultation rights, (v) increased the Committee's professional fee budget and investigation budget, and (vi) established a deadline of May 7, 2019 (the "Challenge Deadline") by which the Committee could seek standing to assert a challenge to the Prepetition Lien and Claim Matters (as defined in the Final DIP Order) (a "Challenge").

16.     On or about March 14, 2019, the Committee served the Debtors and the Eos Parties with extensive requests for production of documents.  From that date through approximately April 15, 2019, the Debtors and the Eos Parties engaged in extensive negotiations with the Committee regarding the propounded discovery and requests by the Committee for depositions of the Debtors and the Eos Parties.  Both the Debtors and the Eos Parties spent considerable time gathering responsive documents and commenced production of responsive information to the Committee on a rolling basis.

### C.     The Sales to TFI and Tiger

17.     Prior to the Petition Date, on February 14, 2019, the Debtors entered into that certain asset purchase agreement by and between TForce Final Mile, LLC, TForce Final Mile West, LLC and TForce Logistics, LLC (collectively, "TFI"), as buyer, and BeavEx Inc., JNJW Enterprises, Inc., and USXP, LLC, as sellers, dated February 14, 2019 (the "Lead Agreement" or the "APA") for the sale of certain of their assets.  The Lead Agreement, among other things, provided for a cash purchase price of approximately $7.2 million, plus the

assumption of certain liabilities, and was subject to the Debtors soliciting higher and better offers.

18.    On February 18, 2019, the Debtors filed a motion [Docket No. 16] (the "Sale Motion") for entry of orders, among other things, (i) approving certain bidding and auction procedures (the "Bidding Procedures") for the sale of all or substantially all of the Debtors' assets and (ii) authorizing the sale of certain of the Debtors' assets to TFI or another successful bidder.  On March 14, 2019, the Court entered an order [Docket No. 151] (the "Bid Procedures Order") that, among other things, approved certain bidding and auction procedures and scheduled a sale hearing for April 16, 2019 (ET) (the "Sale Hearing").  Following the Sale Hearing, on April 17, 2019, the Court entered (i) an order authorizing and approving the sale (the "TFI Sale") of certain of the Debtors' assets to TFI pursuant to the Lead Agreement [Docket No. 241] (the "TFI Sale Order") and (ii) an order authorizing and approving the sale (the "Tiger Sale" together with the TFI Sale, the "Sales") of certain of the Debtors' accounts receivable to Tiger Capital Group, LLC [Docket No. 242] (the "Tiger Sale Order" together with the TFI Sale Order, the "Sale Orders").  The Debtors anticipate that the Sales will close on or before April 29, 2019.

**D.      Resolution of Potential Sale Objections and/or Challenge by the Committee**

19.    As announced on the record at the Sale Hearing, shortly before the commencement of the Sale Hearing, the Debtors, the Eos Parties and the Committee settled, subject to entry of an order approving the Settlement, any and all issues pertaining to the proposed Sales, along with the Committee's ongoing investigation with respect to a potential Challenge.  Certain of the material terms of the proposed Settlement were included in the Sale Orders and others were read into the record, subject to filing of the instant Motion and approval

of the Proposed Order.  As discussed below, the Settlement creates the only means through

which the Debtors' estates could (i) proceed with closing the Sales on an uncontested and

appeal-free basis, (ii) avoid ongoing and time consuming discovery related to the Committee's

Challenge investigation, (iii) ensure the estates do not become mired in litigation regarding a

potential Challenge on or prior to the Challenge Deadline, (iv) ensure a deliberate and fully

funded wind down of the Debtors' remaining estates and assets, and (v) maximize the potential

for a recovery to general unsecured creditors.

### THE SETTLEMENT

20.     As described on the record at the Sale Hearing, the Settlement will be

implemented through (i) the existing sale process and the closing of the Sales, (ii) this Motion,

(iii) the wind-down of the administration of the estates by the Debtors, in their sole discretion,

and liquidation of the remaining collateral with the consent of the Eos Parties and in accordance

with a budget (the "Wind-Down Budget"), and thereafter, (iv) conversion to a chapter 7

bankruptcy.

21.     The material terms of the Settlement are as follows:[3]

a.     Each of the Sale Orders were modified to include the following
paragraph:

Subject to the provisions of the Final DIP Order and upon
(a) approval of the Settlement among the Debtors, the DIP Lender,
the Prepetition Secured Parties and the Committee read into the
record at the Sale Hearing (Court approval of which will be sought
at the May 15, 2019 hearing in these cases), and (b) the Closing of
(i) the Sale, (ii) the Debtors' sale of accounts receivable
constituting Excluded Assets under the APA to Tiger Capital
Group, LLC that is subject to a separate order, or (iii) the closing
of any other sale of assets constituting the collateral of the DIP
Lender or the Prepetition Secured Parties, all cash then held by the
Debtors in excess of (i) amounts necessary to fund a wind-down

---

[3] The following is a summary of the Settlement and is qualified in its entirety by reference to the Settlement as set
forth in the Proposed Order, the terms of which control.

budget to be prepared by the Debtors, in consultation with the Committee, the DIP Lender and the Prepetition Secured Parties and subject to agreement by the DIP Lender and the Prepetition Secured Parties (the "<u>Wind-Down Budget</u>"); and (ii) $500,000 (the "<u>Settlement Amount</u>") shall be remitted to the DIP Lender or the Prepetition Secured Parties, as applicable, in accordance with paragraph 14 of this Order.  If and to the extent the Debtors' cases are converted to a case under chapter 7 of the Bankruptcy Code, any cash held by the Debtors in excess of the Settlement Amount and that remain unspent under the wind-down budget (other than the Carve-Out amounts) shall be remitted to the DIP Lender or the Prepetition Secured Parties, as applicable, in accordance with the provisions of this Order, including paragraphs 13 and 14 of this Order, prior to such conversion.

*See* TFI Sale Order, at ¶ 22; Tiger Sale Order, at ¶ 15.

    b.    Other than as provided in the Settlement, all proceeds from the sale of the Eos Parties' collateral shall be paid directly to the Eos Parties;

    c.    The Committee and each of its members in their individual capacity agreed to fully support the sale and not object to the sale motion;

    d.    The Parties shall mutually and generally release and discharge one another from any and all claims and causes of action;

    e.    The Eos Parties shall release their liens on and interests in the Settlement Amount subject to the following: (i) to the extent a chapter 7 trustee makes distributions, amounts available to the chapter 7 trustee will be distributed in accordance with the priorities in the Bankruptcy Code and (ii) the Eos Parties agree to subordinate the Eos Parties' deficiency claim to the allowed claims held by general unsecured creditors until such time as the holders of allowed general unsecured claims receive $500,000 in the aggregate, and, thereafter, the Eos Parties will share *pro rata* with the general unsecured creditors on any additional distributions to general unsecured creditors;

    f.    The Committee and each of its members in their individual capacity consents to shortening of and expiration of the Challenge Deadline as applicable to the Committee and each of its members in their individual capacity upon approval of the 9019 Motion and agrees that the stipulations in the Final DIP Order become final without any further action by any party upon approval of the 9019 Motion;

g.        The Committee and each of its members in their individual capacity waive the right to seek any additional discovery or standing to assert a Challenge and any discovery that has been served is deemed withdrawn without further order of the Court;

h.        Upon the Proposed Order becoming a final, non-appealable order, the Eos Parties will waive any adequate protection claim on account of their prepetition secured debt with respect to the Settlement Amount;

i.        All other claims and causes of action not released shall remain with the Debtors' estates;

j.        Upon completion by the Debtors of their wind-down of the administration of their estates in their sole discretion and liquidation of the remaining collateral with the consent of the Eos Parties, the Chapter 11 Cases will be converted to cases under chapter 7 of the Bankruptcy Code; and

k.        The Wind Down Budget, in the form attached to the Proposed Order as Exhibit 1, is agreed to by and among the Parties.

## Relief Requested

22.        By this Motion, and pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, the Debtors respectfully request that the Court enter the Proposed Order (i) approving the Settlement, and (ii) authorizing the Debtors to take any and all actions necessary to effectuate the Settlement.

## Basis for Relief Requested

23.        Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The Third Circuit has enumerated four factors that should be considered in determining whether a settlement should be approved. The four enumerated factors are "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *accord Will*

*v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) (finding that the *Martin* factors are useful when analyzing a settlement of a claim against the debtor as well as a claim belonging to the debtor).

24.    The decision to approve a settlement "is within the sound discretion of the bankruptcy court." *In re World Health Alternatives*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); *see also In re Neshaminy Office Bldg. Assoc.*, 62 B.R. 798, 803 (E.D. Pa. 1986), *cited with approval in In re Martin*, 91 F.3d 389 at 393.  The bankruptcy court should not substitute its judgment for that of the debtor.  *See In re Neshaminy*, 62 B.R. at 803.  The bankruptcy court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to see whether the settlement falls below the lowest point in the range of reasonableness.  *See In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983); *see also In re World Health Alternatives*, 344 B.R. at 296 ("[T]he court does not have to be convinced that the settlement is the best possible compromise.  Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities.") (internal citations and quotations omitted).

25.    The Debtors submit that the resolutions embodied in the Settlement are reasonable and in the best interests of the Debtors, their estates, and creditors.  As an initial matter, "[t]he federal courts have a well-established policy of encouraging settlement to promote judicial economy and limit the waste of judicial resources." *Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*, 523 F. Supp. 2d 376, 384 (S.D.N.Y. 2007); *see also, e.g.*, *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 27–28 (1994) (discussing the general utility of settlement vis-à-vis judicial economy).  The force of this established federal policy is particularly acute in the bankruptcy context, where compromises and settlements are "a

normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

26.      Indeed, in order to "minimize litigation and expedite the administration of a bankruptcy estate, 'compromises are favored in bankruptcy.'" *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 Alan N. Resnick & Henry J. Sommer, COLLIER ON BANKRUPTCY ¶ 9019.03[1] (15th ed. rev. 1993)); *see also In re Penn. Cent. Transp. Co.*, 596 F.2d 1102 (3d Cir. 1979); *In re World Health Alts., Inc.*, 344 B.R. at 296; *In re Culmtech, Ltd.*, 118 B.R. 237, 238 (Bankr. M.D. Pa. 1990).  The Settlement is the type of compromised favored in chapter 11 cases because it provides for a fair and practical resolution of disputed issues that, if litigated to their conclusion, could consume a significant portion of the Debtors' limited resources.  Further, the Settlement was the product of extensive arm's length discussions and negotiations between the Parties, and the agreement embodied therein falls well above the lowest point in the range of reasonableness.  In addition, as discussed below, the applicable *Martin* factors weigh in favor of approving the Settlement.

27.      First, the resolutions of the issues and controversies embodied in the Settlement resolved the Committee's informal objections to the Sales and a potential Challenge. While the Debtors believed they would succeed in their endeavor to have the Sales approved over the objections from the Committee and the Eos Parties are confident no valid basis exists to mount a Challenge, the Debtors also understand that the Committee believed that it would prevail on any formal objection to the Sales and that all Parties understand that any Challenge, whether successful or not, would layer significant costs and delay on the administration of the Chapter 11 Cases.

28.     As with all litigation, however, the result of litigation is uncertain, and litigating the issues resolved by the Settlement would be expensive, complicated and fact-intensive.  Absent approval of the Settlement, the matters addressed by the Settlement would need to be litigated not only before the Court but potentially also on appeal—with no guaranties of a more favorable outcome for the Debtors.  Indeed, litigation carries the inherent risk of an adverse judgment that could damage the Debtors, which would diminish the value of the Debtors' assets.

29.     In contrast to the uncertainty and inherent risk to litigation, and the unavoidable expenditures related thereto, the Settlement significantly reduces the estates' potential costs and assists the Debtors in maximizing the value of their estates through the Sales and the timely closing of such Sales, providing a possible recovery to general unsecured creditors and facilitating the timely and cost-effective conclusion of these Chapter 11 Cases.  As such, the Settlement is well above the lowest point in the range of reasonableness.  Accordingly, the Debtors submit that the Settlement meets the first factor of the *Martin* test.

30.     Second, extended litigation may interfere with the Debtors' ability to consummate the Sales and realize the maximum value for assets being sold by the Debtors for the benefit of their estates and creditors.  If the Debtors are unable to close the Sales on the timeline required under the DIP Facility due to protracted litigation with the Committee or if the Committee engaged in adverse litigation concerning a Challenge, the Debtors would be in default of the DIP Facility and thus forced to address the consequences of a lack of liquidity, absent alternative financing, and inability to use cash collateral on a consensual basis.  The Settlement avoids such a scenario by providing a consensual resolution of the issues and controversies among the Parties for the benefit of the Debtors' estates and creditors.

31.     Third, the complexity of litigation involved, the expense, inconvenience and delay attending it would be detrimental to the Debtors.  The Settlement satisfies the third factor in *Martin's* four-factor test because failing to achieve a consensual resolution of the matters being settled would add inconvenience, expense, and potential delays to these Chapter 11 Cases — effects that would be borne by the Debtors and their creditors at large.  Absent a settlement, any dispute over the Sales between the Parties or a Challenge by the Committee would require extensive discovery and a hearing concerning the issues.  Indeed, the Parties were already in the midst of costly and time-consuming discovery related to the Committee's Challenge investigation at the time the Settlement was reached.  Litigating these disputes to completion could be a complex, lengthy, expensive, and burdensome process—a process which the Settlement obviates in full.  The Debtors have limited resources to expend in these Chapter 11 Cases and the Settlement preserves the resources of the estates.  Accordingly, the third factor of *Martin's* four-factor test is satisfied and weighs in favor of the Court approving the Settlement.

32.     Fourth, the Settlement serves the paramount interest of the Debtors' creditors as it resolves potential claims against the estates without further cost, thereby preserving estate assets and furthering the Debtors' ability to administer these cases to completion and provide a potential recovery to general unsecured creditors.  Moreover, obviating litigation of the disputes covered by the Settlement will allow the Debtor and its professionals to focus on working collaboratively with the Committee to bring these Chapter 11 Cases to an orderly and efficient resolution.  Accordingly, the Debtors submit that the final *Martin* factor is also met.

33.    Finally, the Settlement and the transactions contemplated therein are a sound exercise of the Debtors' business judgment.  The Settlement is the product of significant arm's length negotiations between the Parties and their respective representatives and represents a comprehensive resolution of the Parties' disputes.  In light of the above, the resolution of these disputes, as embodied in the Settlement, (i) is fair and equitable; (ii) represents a compromise that rests well above the lowest point in the range of reasonableness; (iii) obviates the expense, delay, inconvenience, and uncertainty that would attend any litigation of the Parties' issues; and (iv) advances the paramount interests of creditors.  For all of these reasons, the Debtor submits that the Settlement satisfies Bankruptcy Rule 9019 and should be approved.

## Notice

34.    Notice of this Motion will be provided to the following parties:  (i) the Office of the United States Trustee; (ii) counsel to the Committee; (iii) each member of the Committee; (iv) counsel to the Eos Parties; and (v) all parties requesting notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (i) enter the Proposed Order and (ii) grant such other and further relief as the Court may deem just and proper.

Dated: April 24, 2019
       Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/  Joseph M. Barry*
Joseph M. Barry (No. 4221)
Matthew B. Lunn (No. 4119)
Donald J. Bowman, Jr. (No. 4383)
Jordan E. Sazant (No. 6515)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:   (302) 571-1253

*Counsel for the Debtors and Debtors in Possession*